1  Lionel Z. Glancy (#134180)
2  Michael Goldberg (#188669)
   GLANCY BINKOW & GOLDBERG LLP
3  1925 Century Park East, Suite 2100
4  Los Angeles, California 90067
   Telephone: (310) 201-9150
5  Facsimile:  (310) 201-9160
   E-mail: info@glancylaw.com
6
7  Attorneys for Plaintiff
   [Additional Counsel on Signature Page]

8
9              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
                   WESTERN DIVISION
10

11  THE PLAZA COMPANY, on Behalf of        Case No. CV13-05274-PA
    Itself and a Class of All Others Similarly                    (RZ)
12  Situated,

13                     Plaintiff,           CLASS ACTION COMPLAINT
                                            FOR DAMAGES AND
14      v.                                  INJUNCTIVE RELIEF

15  NONG SHIM COMPANY., LTD.; NONG
    SHIM AMERICA, INC.; OTTOGI             JURY TRIAL DEMANDED
16  COMPANY, LTD.; OTTOGI AMERICA,
    INC.; SAMYANG FOODS COMPANY,
17  LTD.; SAMYANG USA; PALDO
    AMERICA; AND KOREA YAKULT,
18
                       Defendants.
19

20
21
22
23
24
25
26
27
28

FILED
CLERK, U.S. DISTRICT COURT

JUL 2 2 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## INTRODUCTION AND SUMMARY

1.     Plaintiff and Class Representative The Plaza Company ("Plaintiff" or "Plaza") brings this action individually and on behalf of a Class consisting of all persons and entities who directly  purchased Korean Noodles (defined in paragraphs 38-40 below) from Defendants in the United States from May 2001 to the present (the "Class").

2.     This action arises out of a long-running conspiracy among defendants Nong Shim, Samyang, Ottogi, Korea Yakult, and each of their U.S. subsidiaries (collectively, "Defendants") to agree, combine and conspire to fix, raise, maintain and/or stabilize the prices at which Korean Noodles were sold in the U.S. and elsewhere.   Between 2001 and 2008, Defendants increased their prices for various products six times, resulting in a total price increase of approximately 54%.

3.     This conspiracy was hidden from the public until July 12, 2012, when the Korean Fair Trade Commission ("KFTC") issued an order and findings (the "KFTC Order") revealing that the Defendants had colluded to increase prices and keep such prices inflated.  The KFTC Order revealed that collusion manifested itself in at least two formal in-person meetings between the Defendants (in 2001 and 2008), as well as hundreds of email communications between and among the Defendants.

4.     The KFTC Order also required the Defendants to pay a total of $136 billion won (approximately $120 million).

5.     Defendants' price-fixing conspiracy resulted in increased prices for Korean Noodles sold in the United States and its territories (collectively "United States").

## JURISDICTION AND VENUE

6.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1337, because this action arises under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.     Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1392 (b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

8.     This Court has personal jurisdiction over each of the Defendants because they, directly and/or through affiliates: (a) have headquarters in this District, (b) transacted business throughout the United States, including in this District, (c) have had substantial contacts with the United States, including in this District; and/or (d) were engaged in illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

9.     Defendants' conduct alleged in this complaint involves import trade and import commerce with the Republic of Korea ("Korea" or "South Korea").   The conduct also has a direct, substantial, and reasonably foreseeable effect on U.S. trade or commerce.

## PLAINTIFF

10.     Plaintiff is a corporation organized, existing, and doing business under the laws of California with its principal place of business located in this District. Plaintiff directly purchased Korean Noodles from one or more of the Defendants.  As a result of the federal antitrust law violations described herein, Plaza was injured in its business or property.

## DEFENDANTS

### Nong Shim

11.     Defendant Nong Shim Co. Ltd established in 1965, is organized and existing under the laws of South Korea with its principal place of business in Dongjak-Gu Seoul, South Korea.   During the Class Period, Nong Shim Co. Ltd participated in the price-fixing scheme alleged herein.

12.     Nong Shim Co. Ltd is a leading food company in South Korea.  Nong Shim Co. Ltd has had a high market share in Korea since the 1990s and, since 2010,

represents approximately 70% of the Korean Noodles business in Korea. Upon information and belief, in the United States during the Class Period, Nong Shim Co. Ltd. also held a dominant share of the market for Korean Noodles.  In 2002, Nong Shim Co. Ltd decided to establish a U.S. manufacturing plant, Nong Shim Co. Ltd which established its United States manufacturing facility in Rancho Cucamonga, California in June of 2005.  Nong Shim Co. Ltd stated in 2012 that it is actively looking to establish a second manufacturing facility in the Eastern part of the United States with the goal to begin production in the next few years.

13.    Nong Shim America, Inc. ("Nong Shim America") is headquartered in Rancho Cucamonga, California.  It has other locations in Emeryville California, as well as in Texas, New Jersey, Illinois, Georgia, and Maryland.  Nong Shim America is a wholly owned and controlled subsidiary of Nong Shim. [1]

14.    Nong Shim Co. Ltd and Nong Shim America are referred to collectively herein as "Nong Shim".

15.    United States sales of Nong Shim's Korean Noodles accounts for 15% of the company's consolidated sales and 7% of the total operating profit in 2010.  As of 2006, United States sales accounted for 34.1% of Nong Shim's non-Korean sales.

---

[1] Nong Shim is the only defendant to have a factory in the United States, which opened in 2005.  Nong Shim's 2008 Factbook stated that this his factory produces approximately 200 million packs of instant noodles per year, including several of Nong Shim's key products, such as Shin Ramyun and Yukgaejung Bowl Noodle Soup.

16.    According to 2008 and 2009 annual report of Nong Shim, and Nong Shim America sales revenues in the United States during 2005-09 were as follows:



**Ottogi.**

17.    Defendant Ottogi Co. Ltd was formed in 1969, under its original name Pung-Lim Company.  Ottogi Co. Ltd is headquartered in Daechi-dong Gangnam-gu, Seoul, Korea.

18.    Defendant Ottogi America, Inc. ("Ottogi America") was formed in 2005, and is headquartered and has a warehouse in Gardena, California.  Ottogi America is a wholly owned and controlled subsidiary of Ottogi.  Ottogi America sells and distributes Ottogi's Korean Noodles throughout the United States.  Ottogi's noodle products are all manufactured in Korea.

19.    Defendants Ottogi Co Ltd and Ottogi America are referred to collectively at "Ottogi."

**Samyang**

20.    Defendant Samyang Foods Co. Ltd is headquartered in Seongbuk-Gu, Seoul, Korea.

21.    Defendant Samyang USA is headquartered in Santa Fe Springs, California.    Samyang USA is a wholly owned and controlled subsidiary of Samyang. Samyang USA sells and distributes Samyang's Korean Noodles throughout the United States.  Samyang's noodle products are all manufactured in Korea.

22.    Defendants Samyang Foods Co. Ltd and Samyang USA are referred to collectively at "Samyang."

**Korea Yakult**

23.    Defendant Korea Yakult, founded in 1969, is based in Seochu-gu, Seoul, Korea.  It makes beverages, Korean Noodles, and other dairy products.  In fact, the term "yakult" refers to a Korean yogurt drink.

24.    Korea Yakult distributes its products overseas under the name Paldo. Defendant Paldo America is located in Los Angeles, California.  Paldo America is a wholly owned and controlled subsidiary of Korea Yakult. Paldo America distributes Korea Yakult's Korean Noodles throughout the United States.  Korea Yakult's noodle products are all manufactured in Korea.

25.    Korea Yakult and Paldo America are referred to herein at "Yakult."

**INTERSTATE TRADE AND COMMERCE**

26.    The violations of federal antitrust laws alleged herein have impacted substantial amount of interstate trade and commerce.

**NON-DEFENDANT, NAMED CO-CONSPIRATORS**

27.    Various entities not named as defendants have participated in the violations alleged herein and have performed action and made statements in furtherance thereof.  Plaintiff reserves the right to name some or all of these entities at a later date.  The acts alleged herein that were done by each of the con-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives of

1  each co-conspirator while actively engaged in the management, direction, or control

2  of its affairs.

## CLASS ACTION ALLEGATIONS

4      28.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2)

5  and 23(b)(3) on its own behalf and on behalf of the following class (the "Class"):

> All Persons and entities in the United States who purchased Korean
> Noodles directly from Defendants at any time from May 2001 through
> the present.  The Class excludes the Defendants, co-conspirators, and
> any of their subsidiaries or affiliates.  The Class also excludes all judicial
> officers presiding over this action and their immediate family members
> and staff, and any juror assigned to this action.

11      29.    Members of the Class are so numerous that joinder is impracticable. Due

12  to the nature of the trade and commerce involved, Plaintiff believes that the Class

13  members number in at least the thousands and are so geographically diverse that

14  joinder of all Class members is impracticable.

15      30.    Plaintiff's claims are typical of the claims of other Class members, as

16  they arise out of the same course of conduct.  Consequently, Plaintiff's interests are

17  aligned with, and not antagonistic to, those of the other members of the Class.

18  Accordingly, by proving Plaintiff's own claim, Plaintiff will prove other class

19  members' claims as well.

20      31.    Questions of law and fact are common to all members of the Class, and

21  such common issues of law and fact predominate over any questions affecting only

22  individual members of the Class. The common issues of law and fact include, but are

23  not limited to, the following:

> a. whether Defendants engaged in or entered into a contract,
>    combination or conspiracy among themselves to fix, maintain,
>    raise and/or stabilize the prices of Korean Noodles sold in the
>    United States;

b. whether Defendants' unlawful conduct has enabled them to increase, raise, maintain or stabilize above competitive levels the prices for Korean Noodles sold in the United States;

c. the duration of the contract, combination, or conspiracy alleged herein;

d. whether Defendants violated Section 1 of the Sherman Act;

e. whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and Class members;

f. whether Defendants' conspiracy affected the prices of Korean Noodles sold in the United States;

g. the appropriate measure of damages sustained by Plaintiff and Class members;

h. whether injunctive relief is appropriate; and

i. the appropriate class-wide measure of damages.

32.     These common questions and other predominate over question, if any, that affect only individual Class members.

33.     Plaintiff and its counsel can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.  Plaintiff understands and appreciates its duties to the Class under Rule 23 of the Federal Rules of Civil Procedure, is determined to diligently discharge those duties, and is committed to vigorously protecting the rights of absent Class members. Plaintiff has retained counsel who is competent and experienced in the prosecution of class action lawsuits and, in particular, antitrust class action lawsuits. Plaintiff and counsel have the necessary financial resources to adequately and vigorously litigate this class action.

34.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because the Defendants have acted or refused to act on grounds that apply generally to the

1   class, so that final injunctive relief or corresponding declaratory relief is appropriate

2   respecting the class as a whole.

3       35.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because

4   common questions predominate over individual questions and a class action is the

5   superior procedural vehicle for fairly and efficiently adjudicating the claims asserted.

6       36.   The questions of law and fact common to the members of the Class, as

7   identified above, predominate over any questions affecting only individual members,

8   including legal and factual issues relating to the Defendants' liability and damages.

9   Plaintiff's claims and other Class members' claims arise from the same course of

10   conduct and Plaintiff and other Class members share the same legal rights.

11       37.   A class action is superior to other available methods for the fair and

12   efficient adjudication of this controversy. Prosecution as a class action will eliminate

13   the possibility of needlessly repetitious litigation. Separate actions by individual Class

14   members would also create a risk of inconsistent or varying judgments, which could

15   establish incompatible standards of conduct for the Defendants and substantially

16   impede or impair the ability of Class members to pursue their claims. There would be

17   enormous efficiencies to the Court and the parties in litigating the common issues on a

18   class-wide, instead of a repetitive individual, basis. Treatment as a class action will

19   permit a large number of similarly situated persons to adjudicate their common claims

20   in a single forum simultaneously, efficiently, and without the duplication of effort and

21   expense that numerous individual actions would engender. This action presents no

22   difficulties in management that would preclude maintenance as a class action under

23   both Fed. R. Civ. P. 23(b)(3).

## FACTUAL BACKGROUND

24

25   **Korean Noodles Constitute A Unique Market Distinct From Other Instant**

26   **Noodles**

27       38.   Korean Noodles subject to the KFTC Order included instant noodles

28   manufactured by the Defendants that are often sold with seasoning packet or

dehydrated vegetables, and are packaged either in a packet or a cup or bowl. With a packet, the noodles are cooked in water, and then the seasoning and dehydrated vegetables are added. With a cup or bowl, the seasoning and vegetables are already included in the cup, and hot water is added to the cup.

39.  In addition, Korean Noodles that were the subject to the KFTC Order include, but are not limited to, the following:

- Kimchi Ramen – ramen noodles with kimchi added
- Udon – thick wheat-based noodle
- Kalgugsu – flat noodles with seafood
- Chajang - noodles with black bean or soy bean paste
- Champong – spicy seafood noodle soup
- Bibimmyun – spicy cold noodles
- Yukgaejang – spicy soup with beef and scallions
- Potato Ramen – ramen made with potato starch

40.  Korean Noodles often have a different flavor profile than other types of noodles sold in the United States, including Japanese ramen. Korean Noodles have unique spices, which are often hotter than instant noodles from Japan, China, or elsewhere. Korean Noodles are marketed in the United States as a premium product compared to other noodles.

41.  For example, Nong Shim's 2003 Factbook stated that:

- "By targeting Korean Americans and locals, exports to the United States increased by 14.2% over the previous year . . ."
- "Three Japanese firms, Maruchan, Nissin, and Sanyo, are competing on low-priced products, whereas Nong Shim is focused on differentiating itself through high-end products."
- Nong Shim's marketing strategy is focused on enhancing its brand image through strengthening its marketing emphasis on "Korean Taste".

42.  Similarly, Nong Shim's 2006 Factbook stated that:

- "Nong Shim is continuously spreading its unique taste, the representative taste of Korea, to every corner of the world."

- "Nong Shim continues to create unique tastes that appeal to Koreans through constant research and development efforts, which has allowed us to keep our top position in the domestic Ramyun market for the past 20 years."

- "Nong Shim's hot taste came up with explosive demands from the markets
  of Korean Americans and Asian Americans, dramatically increasing our export quantities and motivating us to set up a local factory in LA where we saw the biggest potential and geographical advantage in 2005 for the new momentum of our Globalization strategy."

- "This success was because Nong Shim's main product, Shin Ramyun, was created with a unique taste to fulfill its consumers' needs through well balancing the taste of red chili and beef in the hot soup and supplementary soup ingredients such as dried green onion and mushroom with chewy noodles of high quality flour."

43. Similarly, Nong Shim's 2008 Factbook stated that:

- "Targeting over 1.4 million ethnic Koreans living in the US, we have exported instant noodles to Los Angeles since 1971."

- "The North American market, which ranks fourth in instant noodle consumption, is in its early stages of maturity.  However, the high-end product market is still emerging.   Through market segmentation strategies, Nong Shim is reducing its dependence on ethnic Koreans in the US and moving toward the Hispanic market, which has a high growth potential, as well as toward the mainstream market in the East."

44. Similarly, Nong Shim's 2009 Factbook stated that:

- "Nong Shim has successfully tapped in into the US market by putting emphasis on down-to-earth marketing and merchandising. . . . Nong Shim has made stable growth in the US consumer markets as well as Korean American and Chinese American consumer markets. Sales of 'SHIN' brand recorded US $32 million in the same period, which indicate an accelerated globalization of the brand."

45.     Yakult's Hwa Ramen has a similar flavor profile to Nong Shim's Shin Ramyun, and "rivals the bestselling Shin ramyun from Nong Shim in its spiciness and savory broth."

46.     Paldo's ramen products, like Nong Shim's, "are premium quality and offers variety of different styles."[2]

47.     Ottogi's Jin Ramen is similar to Yakult's and Nong Shim's Korean Noodles.  According to orderramen.com, Jin Ramen is a "[p]remium brand from Korea, Ottogi has been making gourmet style ramen for quite some time now. This one is rivaled in its spiciness to Nong Shim's Shin ramyun or Paldo's Hwa ramen."[3]

48.     During the relevant time period, the Defendants sold hundreds of millions worth of noodles in the United States.

**Barriers to Entry**

49.     There are high barriers to the entry of the Korean Noodles market. The manufacture and sale of Korean Noodles is capital-intensive. A company seeking to enter the Korean Noodles business must make a large scale investment in a manufacturing plant and various automated processes.  These challenges to market entry result in limited competition.

---

[2] http://www.orderramen.com/paldo-hwa-ramen-1.html
[3] http://www.orderramen.com/ottogi-jin-hot-ramen-1.html

**The Conspiracy**

50.     Starting in the end of 2000 or beginning of 2001, Defendants each agreed to a specific protocol that would be followed in this and subsequent factory-level price increases.  Nong Shim, as the market leader, would generally increase prices first, and the other Defendants would raise the prices shortly thereafter.[4]  The Defendants would provide each other non-public pricing information, often through each company's market research teams, to promote this collusion.

51.     Once a Defendant made an internal decision to increase factory prices, it would then communicate the price increases to various stores.  With the exception of Nong Shim in May 2001, as is discussed below, other than through communications to stores, information about such price increases was not made publicly available.  However, in furtherance of the conspiracy, Defendants would often communicate non-public details of price increases to each other at the same time, if not before, stores received such information.

52.     Defendants would also use the method of "old price support" to enforce compliance with price increases.  Under this method, a price increase would be decided days or weeks in advance of the increase taking effect.  However, if one Defendant were to announce price increases, and other Defendants failed to do the same, the first Defendant could just delay the price increase until the other Defendants relented and announced their own price increases.  Old price support would prevent any Defendant from gaining a sales advantage from another Defendant's price increase.  In fact, according to a Yakult report, entitled 'The Analysis of Effect of

---

[4] The South Korean government originally controlled the price at which Korean Noodles could be sold, but this price control was abolished in the 1980s.  Nonetheless, Korean Noodles are an important staple in South Korea, and are one of the items used in the calculation of the Customer Price Index.  As such, the South Korean government monitors such price increases.  Nong Shim, for five of the six price increases, notified the South Korean government of proposed price increase shortly before deciding to increase prices.

Price Increase," Nong Shim once delayed old price support for 82 days because Samyang and Ottogi delayed their own price increases.

53.     Defendants' collusion on prices for Korean Noodles happened repeatedly between 2001 and 2008. Samyang's President, OO Kim,[5] affirmed to the KFTC that "'[f]rom price increase in 2001, when I [led] the price increase of [Samyang] for the first time, to price increase in 2008, [the] ramen market [] exercised price information exchange, real price increase work, etc. . . . systematically and repeatedly."

54.     OO Kim also stated that the process would work as follows: "[b]efore the price increase, employees from each company in charge of market research/external business exchanged information. After the price increase, sales team of each company checked on price situation at distribution channels including chain stores. In addition, for the great matters which might jeopardize price system of the business, such as price dumping, the companies maneuvered through" the Ramen Conference, discussed below.

55.     Similarly, OO Yui, a member of Samyang's Marketing Team, stated to the KFTC that "[i]n order not to break the bond of sympathy, which is about exchanging information before announcement of price increase, among ramen companies' employees in charge of market research/external business, I informed the competitors with the information when the proposal was completed or approved, even if not completed, if possible."

56.     According to the KFTC Order, OO Yui further stated that pricing information was often provided to other Defendants even before it was provided to distribution channels:

> It was a rule that employees in charge of external business shared confirmed proposal of price increase before information about price was provided to distribution channels. That is, there was a tacit

---

[5] The KFTC Order identified witnesses by their last name only, and included the designation of "OO" presumably to mask the identity of certain of the individual participants in the conspiracy.

agreement among employees in charge of market research of external business to share information about price increase before ramen manufacturing company provides the proposal of price increase to each distribution channel. Therefore, when it was revealed that one provided price increase proposal to distribution channels first by breaking the agreement, others complained to the employees in charge of the company violated the agreement.

**Defendants' Meetings in 2000 and 2001 and First Price Increase**

57.    In late December of 2000 or early January of 2001, representatives of each Defendant met in the Renaissance Seoul Hotel.  At this meeting, the Defendants agreed to collectively raise the prices of Korean Noodles.

58.    OO Choi, the Chairman of Samyang's Office of Business, reported to OO Chon, Samyang's CEO, about the discussions at this meeting.  OO Choi told OO Chon that "[w]e talked this and that . . . then someone brought up the topic, 'shouldn't be increase ramen price.'  And it seemed that everyone agreed that once Nong Shim increased the price, everyone would increase this price as well."  OO Choi estimated that the price increases would provide Samyang with monthly 200-300 million Korean won.

59.    OO Choi also discussed the meeting with OO Kim, a consultant at Samyang's head business office.  OO Choi told OO Kim that "we talked that it had been 2-3 years since ramen price was increased.  If Nong Shim increase[d] first, others will follow and raise it."

60.    On March 28, 2001, representatives from Nong Shim, Samyang, Yakult, and Ottogi attended the Regular General Assembly of Ramen Conference, held at the Capital Hotel in Seoul.  At this conference, Defendants met and confirmed their agreement to cooperate concerning price increases.  According to OO Ahn, Vice Chair of Samyang's head business office, "[o]ne of the board members of either Ottogi or Paldo asked director [] Yoon of Nong Shim, [if they could] 'increase the price in consecutive order after Nong Shim increase[s] it.  How has the price increase project of your company [] proceeded so far?'"

-14-

61. Ottogi and Yakult representatives responded: "Yes. We wouldn't be released from the pressure of production cost, unless there is a two-digit increase."

62. OO Yoon replied "[w]ouldn't it be difficult to have a two digit increase? I remember that there had not been any two-digit increase in the past . . ., anyway, the price increase will be implemented soon."

63. Thus, at the March 28, 2001 Ramen Conference meeting, Defendants colluded on the subsequent collective price increase.

64. On May 10, 2001, Nong Shim announced to the media that is was increasing the price of its Korean Noodles. Nong Shim provided few details about the price increase, and stated that the amount and timing of the price increase would be determined the following week.

65. That same day, the other Defendants also announced that they were contemplating price increases as well.

66. The announcements of the price increase were unusual – usually price increases were not reported to the media ahead of time.

67. On May 14, 2001, Nong Shim decided to increase factory prices effective May 21, 2001. The factory price increase averaged 9.9% for 34 products.

68. That same day, Nong Shim provided Samyang with specific details about Nong Shim's price increase.

69. An Ottogi internal memorandum, dated May 14, 2001, notes that the price of Jin Ramen would be increased 11%, which was identical to Nong Shim's price increase for Shin Ramyun.

70. On May 17, 2001, Samyang decided to increase factory prices by June 1, 2001. The factory price increase averaged 12% for 17 products. Samyang also decided to increase the price of its Ramen the same amount as Nong Shim's Shin Ramyun.

71. Later, Samyang provided additional non-public details of its price increase to the other Defendants. For example, an internal memorandum from Ottogi,

May 22, 2001, reveals non-public details about Samyang's price increase, demonstrating that Ottogi presumably obtained such information from Samyang as well.

72.   Similarly, "The Report of Examination of Ramen Price Increase Application Period" written by Ottogi's Marketing Team on May 24, 2001, provided significant information concerning the other Defendants' price increases:

- "From June 1st, Nong Shim expects to apply increased price. Provided, Nong Shim is looking for an additional support strategy because it worries the decrease of sales due to the competitors' pushing previous price after normal price increase in June."

- "Samyang decided increased price per item, but increase details and application date on an official document have not been confirmed yet. The expected date of increased price application is early June, and the expected date of previous price application is expected to be until June 15."

73.   "Yakult decided increase price per item, but increase details and application date on an official document have not been confirmed yet. The expected date of increase price application is early June, and the expected date of previous price application is expected to be until June 15." On May 24, 2001, Samyang provided pricing details, by fax, to Yakult.

74.   On May 30, 2001, Yakult decided to increase factory prices effective June 1, 2001. The factory price increase averaged 9.7% for 18 products. Yakult also decided to increase the price of its King Ramen the same amount as Nong Shim's Shin Ramyun.

75.   According to notes created in 2011 by OO Choi, a member of Yakult's legal team: "[d]uring the price increase in 2001, OO Kang working for Yakult Marketing team shared advance information with OO Lee from Nong Shim, OO Kim from Samyang, and OO Hong from Ottogi." His notes also stated that "Before [Yakult's] price increase, Nong Shim confirmed in advance (email) it is assumed that

these data were shared with Ottogi and Samyang."

76.     On May 22, 2001, Ottogi decided to increase factory prices effective June 15, 2001.  The factory price increase averaged 10.5% for 52 products.  Ottogi later pushed the effective date to July 1, 2001, after determining the other Defendants' price support periods.  Ottogi also decided to increase the price of its Ramen to the same price as Nong Shim's Shin Ramyun.

77.     Furthermore Ottogi prepared a report titled "Our Company's Ramen Item Price Adjustment Proposal (Final)" on May 28, 2001.  It sent this report to Yakult soon after it was created.

**Second Price Increase: October 2002 to January 2003**

78.     On October 21, 2002, Nong Shim decided to increase factory prices effective October 25, 2002.  The factory price increase averaged 8.5% for 39 products..

79.     That same day, it provides details and dates concerning this price increase to Samyang.

80.     On October 25, 2002, Samyang decided to increase factory prices effective November 1, 2002.  The factory price increase averaged 9.5% for 28 products.  Samyang also decided to increase the price of its Ramen to the same amount as Nong Shim's Shin Ramyun.

81.     Samyang, through employees on its Market Research team, provides the details of these price increases to the other Defendants.

82.     On November 1, 2002, Yakult decided to increase factory prices effective December 1, 2002.  The factory price increase averaged 8.6% for 25 products.  Yakult also decided to increase the price of King Ramen to the same amount as Nong Shim's Shin Ramyun.

**Third Price Increase: December 2003 to April 2004**

83.     On or around December 15, 2003, Nong Shim decided to increase prices effective December 22, 2003.  The price increase averaged 7.7% for 24 products.

84.    On December 18, 2003, Nong Shim emailed Samyang details of the price increase for each item.

85.    Samyang then provided the details of the price increase to other Defendants, including Nong Shim.

86.    Sometime before February 21, 2004, the Nong Shim Distribution Research Team prepared a report titled "The Trend of Samyang Ramen Price Increase Products Release."   Nong Shim employees presumably prepared this report after receiving the information from Samyang described above.

87.    On January 6, 2004, Yakult decided to increase prices effective February 1, 2004.   The price increase averaged 7.7% for 19 items. Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim's Shin Ramyun.

88.    Samyang and Ottogi later delayed the dates of the price increase, and Yakult accordingly adjusted the date of Yakult's price increase from February 1, 2004 to March 1, 2004.

89.    The leader of Yakult's Distribution Management Team, OO Kim, revealed that Defendants' employees exchanged sales results during this process.   For example, Yakult sent Samyang details of Yakult's price increase, including price increase date and period of old price support, by emails dated January 27, 2004, February 5, 2004, and March 9, 2004.

90.    On February 23, 2004, Ottogi decided to increase factory prices effective April 4, 2004.   The factory price increase averaged 6.9% for 47 products.   Ottogi also decided to increase the price of its Jin Ramen to the same amount as Nong Shim's Shin Ramyun.

**Fourth Price Increase: December 2004 to April 2005**

91.    On or around December 20, 2004, Nong Shim decided to increase prices effective December 24, 2004.   The price increase averaged 7.1% for 37 products.

92.    On December 22, 2004, Nong Shim informed Samyang of the price increase via email.

93.    On February 24, 2005, Samyang decided to increase prices effective March 1, 2005. The price increase, covering 32 items, averaged 7.2%.  Samyang also decided to increase the price of its Ramen to the same amount as Nong Shim's Shin Ramyun.  Samyang then provided the details of the price increase to other Defendants, including Nong Shim.

94.    Samyang then provided the details of the price increase to other Defendants, including Nong Shim.

95.    On January 7, 2005, Yakult decided to increase prices effective February 15, 2005. The price increase, covering 24 items, averaged 7.4%.  Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim's Shin Ramyun.  Later, because the price increase of Samyang and Ottogi were delayed, Yakult delayed the price increase date from February 15, 2005 to March 15, 2005.

96.    On January 11, 2005, Yakult emailed the details of the price increase to Samyang.

97.    Yakult's Management Team created two documents which discuss competitors' price increases: (1) a "Plan of Ramen Price Increase (Proposal)" dated January 5, 2005, and (2) "The Request for Adjustment of Noodle Products Price Increase Period" dated February 11, 2005.  These documents reported proposed price increases for both Samyang and Ottogi.  The later document noted that the "reason for Price Increase Adjustment" was a "[m]arket response to competitors' price increase date and price support."

98.    On February 24, 2005, before Ottogi even conclusively decided to increase prices, Ottogi sent Samyang the details of its proposed price increase.

99.    On February 22, 2005, Nong Shim created a document titled "Meeting for Business Measures" that contained the price increase and support plans of Samyang, Ottogi and Yakult.

100.   Sometime before March 10, 2005, OO Kim at Nong Shim created a document titled "Ottogi's Price Increase Proposal per Item."   The document seemingly contains non-public information concerning Ottogi's factory price increases, as it includes the exact factory prices of products, which would not be known to the public.   For example, the document reveals that for certain products, only the factory price, and not the retail price, would be increased.   An almost identical document was sent by Ottogi to Samyang on February 25, 2005. Accordingly, it is likely that Ottogi provided both Nong Shim and Samyang with this information.

101.   Several of Defendants' employees have opined as to the difficulty of determining factory prices based on retail prices. OO Doh of the Department of Sales Planning at Ottogi stated that "it is difficult to speculate exactly how much the price is.   We can guess approximately how much percentage of price is different from one another based on market price.   However, we cannot know the exact price."   OO Kim, the Chair of the Head Business Office at Ottogi stated that while rated increase could be speculated roughly, "increase rate per item could not be speculated."   OO Suh, the Chair of the Marketing Team at Samyang, stated that "[i]t is not possible to know the exact factory price of a competitors' item by knowing the retail price per item only. That is why ramen companies have exchanged not only the details of retail price increase, but also the details of factory price (release price) when they share price information of increased products in most cases until now."

**Fifth Price Increase: March 2007 to December 2007**

102.   On February 12, 2007, Nong Shim decided to increase factory prices effective March 1, 2007.   The factory price increases, covering 39 items, averaged 6.5%.

103.   On February 23, 2007, Nong Shim sent a notice of price increase (written for the purpose of sending to stores) to Samyang via fax.   On February 26, 2007, Nong Shim sent to Samyang the details of the price increase via email.

104.   On February 28, 2007, the Ottogi Marketing Team wrote "The Report of Price Increase of Nong Shim Ramen and Snacks."  This report detailed specifics of Nong Shim, Samyang, and Yakult's upcoming price increases.

105.   In early and mid March 2007, Nong Shim sent the release date and details of price support to Samyang.  Samyang included this information in an internal document, dated February 26, 2007, titled "Details of Nong Shim's Price Increase in March 2007 (No. 1)."

106.   A March 5, 2007 document, written by the Yakult Noodle Marketing Team, titled "The Ramen Price Increase in 2007," reports details of the Nong Shim price increase, and the progress of Samyang and Ottogi's price increase projects.

107.   On March 7, 2007, Yakult decided to increase factory prices effective April 1, 2007.  The factory price increases, covering 21 items, averaged 6.6%.  Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim's Shin Ramyun.

108.   On March 20, 2007, Yakult emailed details of this price increase to Samyang.

109.   On March 22, 2007, Samyang decided to increase factory prices effective April 16, 2007.  The factory price increases, covering 28 items, averaged 7.3%.  Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nong Shim's Shin Ramyun.

110.   On April 11, 2007, Samyang provided details about its price increase to both Nong Shim and Ottogi via email.  The email, from OO Yui of Samyang to OO Yoon at Nong Shim and OO Chung at Ottogi, stated that "the price increase seems to be implemented by the 16th.  However, I should tell you that there is little bit of possibility that the date would be changed.  Please refer to the attached document for the details of price increase.  This document is a final draft, but had not been confirmed.  PM in charge of the price increase said that the increase would be implemented almost as the document said."

111.   On April 17, 2007, OO Yui of Samyang sent OO Yoon of Nong Shim an email detailing production dates of Samyang's price increased products.

112.   On May 4, 2007, OO Yui of Samyang sent OO Jung from Ottogi and email about Samyang's old price support period.

113.   On February 28, 2007, Ottogi's Marketing No.3 Team created "The Report of Price Increase of Nong Shim Ramen and Snacks."   This report accurately tracked the details of what became Yakult's price increase.   Specifically, the report noted, as to its competitors:

- "Although Nong Shim continuously has sent out a rumor of price increase since the end of 2006, sales of that year declined about 1.2%.   Therefore, internally the company had much more dispute about price increase.   However, because of the continued decline of ramen market, it is evident to promote the growth of sales amount and of profit through price increase, rather than through growing the quantity of the sales, and because of its exclusive market share, the company judged that the market dynamics would not change much after the price increase.   Therefore, Nong Shim decided to implement the price increase."KFTC Order at

114.   "The Examination of Price Increase of Ramen Products."   This document recommended increasing prices at the same level of Nong Shim, and detailed the proposals of such a price increase.

115.   On June 26, 2007, Ottogi Marketing Team wrote "the Report of Ramen Products Price Increase."   This report noted that information was obtained "after checking with the Samyang Marketing Team."   The report recommended raising prices on September 1, 2007, once such information was obtained.

116.   On July 23, 2007, Ottogi decided to increase factory prices effective September 1, 2007.   The factory price increases, totaling 90 items, averaged 4%.   Ottogi also decided to reduce a discount rate by 4%, so the actual average increase totaled 8%.   Ottogi also chose to increase the factory price of its Jin Ramen to 417

won, which was still lower than Nong Shim's Shim Ramyun price of 430 won, but came out to the same price after taking into account the reduced discount rate.

117.  On July 27 and July 31, 2007, OO Jung of Ottogi emailed OO Yui of Samyang details of the Ottogi price increase.

118.  On August 10, 2007, OO Choi of Nong Shim emailed OO Yui of Samyang, stating that "[a]s far as I know, Ottogi has not officially notified so far. . . . Its price increase rate is the shame as our company's and Samyang's, if we consider the result only."

119.  On August 16, 2007, OO Kim of Yakult emailed OO Yui of Samyang the details of Ottogi's price increase.

**Sixth Price Increase - February to April 2008**

120.  From February 20, 2007 to March 3, 2008, Nong Shim sent various emails to Samyang detailing their price increases.

121.  In early 2008, Nong Shim decided to increase factory prices.  The factory price increases, covering 42 items, averaged 11.9%.

122.  On February 18, 2008, OO Choi of Nong Shim sent OO Yui of Samyang an email stating that Nong Shim's price increase "is planned to be officially announced this afternoon, so I will inform you again when the price is announced. :D And this information might be wrong, so please do not have a blind faith in it.  And, please pretend of Yakult that you haven't received this provisional price."  OO Choi sent OO Yui additional updates on February 20th, 22nd, 28th, 29th, and March 3rd.

123.  On February 18, 2008, Samyang decided to increase its prices, effective March 1, 2008.  According to OO Suh, Chair of Samyang's Marketing Team, Samyang then sent the details of this price increase to Nong Shim, Ottogi, and Yakult via wired communication.

124.  On February 28, 2008, Samyang decided to increase factory prices effective March 1, 2008.  The factory price increase, covering 32 items, averaged

11.9%.  Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nong Shim's Shin Ramyun.

125.  On February 27, 2008, OO Yui of Samyang emailed the details of its price increase to OO Choi of Nong Shim.  On March 3, 2008, OO Yui of Samyang sent OO Choi of Nong Shim, OO Kim of Yakult, and OO Jung of Ottogi an email concerning the details of Samyang's old price support.

126.  On February 26, 2008, Ottogi decided to increase factory prices effective April 1, 2008.  The factory price increase, covering 72 items, averaged 9.4%.  However, Ottogi also decided to reduce a discount rate by 4.1%, the so the actual average increase totaled 13.5%.  Ottogi also chose to increase the factory price of its Jin Ramen to 455 won, which was still lower than Nong Shim's Shim Ramyun price, but came out to the same price after taking into account the reduced discount rate.

127.  On February 29, 2008, OO Jung of Ottogi sent OO Yui of Samyang an email concerning Ottogi's price increases, stating "[a]s I told you yesterday, whether or not there would be price increase has not been decided yet.  However, I am sending you the details of price increase which has been in progress so far, so that you can have it as a reference.  Our company has started production of price increased products of cup ramen, such as Jin Ramen multi packets and spaghetti cup ramen, on February 27."  The email included a chart showing price increases for various Ottogi products.

128.  On March 6, 2008, OO Jung sent OO Yui an additional email providing additional details about the dates of the price increases, stating "I am sending you my company's production details for ramen products with new price.  Please refer to it."

129.  On March 10, 2008, Yakult decided to increase factory prices for major products effective April 1, 2008, and various other products effective May 1, 2008.  The factory price increase, totaling 23 items, averaged 12.5%.  Yakult also decided to increase the price of its King Ramen the same amount as Nong Shim's Shin Ramyun.

**March 2008 Ramen Conference**

130.   On March 26, 2008, the General Assembly of Ramen Conference was held at Capital Hotel in Seoul.  At this conference, the Defendants all agreed that they would postpone price increases or lower prices after an increase.

131.   OO Lee, Board Director of Samyang's Head Business Office, stated to the KFTC that: "Since the new administration [of the South Korean government], inaugurated on February 25, 2008, played an emphasis of price stabilization, it was difficult decision to make a price increase, and because customers' response was also negative about the increase, ramen manufacturing companies worried much about the increase.  Nevertheless, because the price decision had already made based on the exchange of information and date about price increase, each company emphasized (agreed) that any company could not postpone the price increase or that increased price could not be lowered again."

132.   Similarly, OO Kim, Chair of Samyang Business Management Team, noted to the KFTC that due to the change in South Korean government, South Korea "was experiencing the feeling of renewal.  As the new administration suggested price stabilization as a major policy as soon as the president's inauguration, companies including Nong Shim discussed about ramen price which would be increased.  While worrying about criticism or implications that would cause by price increase, we discussed the prospect of the process and strategic responses about the criticism."

133.   Accordingly, the March 2008 Ramen Conference ensured that the raised prices remained inflated in the future.

**KFTC Findings**

134.   On July 12, 2012, the KFTC issued the KFTC Order, concluding that Defendants, who are the four main producers of Korean Noodles, conspired to fix

prices of Korean Noodles.[6]

135.   The KFTC imposed monetary and injunctive relief, including $136 billion won (approximately U.S. $120 million) in fines.   It also ordered the Defendants to stop sharing pricing information.

**The Conspiracy Directly Affected Prices of Korean Noodles Sold In the United States**

136.   The unlawful price increases of factory prices in South Korea affected not only retail prices in Korea, but affected retail prices across the world, including the United States.

137.   During the Class Period, the South Korean Defendants shipped price-fixed Korean Noodles directly to their wholly owned and controlled subsidiaries in the United States for resale in this country.

138.   Thus, during the Class Period, Nong Shim directly shipped its Korean Noodles to Nong Shim America in the United States.   In 2006, for example, sales by region totaled in millions:   U.S. $47.7 (34.1%), China $47.2 (33.8%), Others $44.9 (32.1%).

---

[6] The KFTC Report also noted that a fifth South Korean company, Binggrae, also engaged in the conspiracy.   However, in 2003, Binggrae left the Korean Noodles business.



139.   Also during the Class period, Ottogi directly shipped its Korean Noodles to Ottogi America in the United States.

140.   During the Class period, Samyang also directly shipped its Korean Noodles to Samyang USA in the United States and Korea Yakult directly shipped its Korean Noodles to Paldo in the United States.

141.   On information and belief, the South Korean Defendants tightly oversaw the pricing policies of their United States subsidiaries. Nong Shim provides an example. In 2002, it sought to globalize its Korean Noodles brand in order to capture a greater share of the $540 million United States ramen market. Its goal was to grow profits by 10% annually. It sought to do this through "strategic initiatives" in product development, sales, and distribution. In order to achieve these goals, Nong Shim instituted on a global basis from its headquarters in South Korea a "profitability management information system by product and business" and a "management infrastructure" for sales.

142.   The Defendants engaged in collusive factory-level price increases for their Korean Noodles that were incorporated into their U.S. sales prices of these products.

143.   For example, based on Plaintiff's analysis of Defendants' pricing, during the fifth price increase of Korean Noodles in 2006, Ottogi's price increased 12.5% in the United States, while it effectively increased 8% in South Korea.

144.   Similarly Nong Shim's price for Korean Noodles increased by 11% in the United States, while it increased 6.5% in South Korea.

145.   Furthermore, based on Plaintiff's analysis of Defendants' pricing, during the sixth price increase on Korean Noodles in February to April of 2008, Samyang's prices increased 13.3% in the United States, while they increased 12.6% in South Korea.

146.   Similarly during the same time, Ottogi's prices increased 15% in the United States, while its prices effectively increased 13.5% in South Korea.

147.   As a direct and proximate result of defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**FRAUDULENT CONCEALMENT**

148.   Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim for relief. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing its complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for Korean Noodles.

149.   Because Defendants' agreement, understanding and conspiracy was kept secret, plaintiff and Class members were unaware of Defendants' unlawful conduct

1   alleged herein and did not know that they were paying artificially high prices for

2   Korean Noodles.

3       150. For example, Defendants each issued false and misleading

4   announcements concerning the reasons for their price increases, none of which,

5   disclosed that the Defendants had agreed amongst themselves to fix and raise the price

6   of Korean Noodles. When a party speaks on a subject matter, it must speak the whole

7   truth.

8       151. On May 10, 2001, Nong Shim stated that "main ingredient cost increases

9   like 10% increase of international wheat price with weakening of Korean won pushes

10  manufacturing costs increase 5-10%". No mention of an agreement to fix prices with

11  competitors was provided. A nearly identical misleading statement was made by

12  Nong Shim 6 days later and republished by Bloomberg.

13      152. On October 23, 2002, Nong Shim stated that "it will increase the price

14  around 8% due to the price increase of ingredient, wheat flour". No mention of an

15  agreement to fix prices with competitors was provided.

16      153. On October 24, 2002, Nong Shim stated that "it increases the price due to

17  ingredient price increase like the increases of palm oil, wheat flour and due to

18  management costs increase like freight costs from economic condition changes". No

19  mention of an agreement to fix prices with competitors was provided.

20      154. On October 24, 2002, Korea Yakult stated that "it is inevitable to

21  increase the price . . . due to the price increases of palm oil, wheat flour and the price

22  increase of freight costs" and "it is inevitable for the companies to follow to the price

23  increase range of Nong Shim since Nong Shim is the market leading company". No

24  mention of an agreement to fix prices with competitors was provided.

25      155. On December 18, 2003, Nong Shim stated that "This year, the prices of

26  importing ingredients like palm oil price, starch and domestic produces like red

27  pepper and green onion are greatly increased" and "specifically, the increased costs of

28  management fees like freight costs, promotion costs" required a price increase on

Ramen Instant Noodles. No mention of an agreement to fix prices with competitors was provided.

156. On February 24, 2004, Samyang stated that "the price is increased due to the price increases of ingredients, palm oil and starch, red pepper, green onion and onion since second half of the last year". No mention of an agreement to fix prices with competitors was provided.

157. On December 23, 2004, Nong Shim stated that "For 8~9% price increase of wheat flour and potato starch and 18% increase of vinyl wrapping due to oil price surge makes inevitable to increase the price". No mention of an agreement to fix prices with competitors was provided.

158. On February 28, 2005, Samyang stated that "For 9% price increase of wheat flour and 15% increase of packaging costs pressured cost burden and it was inevitable to increase the price". No mention of an agreement to fix prices with competitors was provided.

159. On February 27, 2007, Nong Shim stated that "recently sudden price increases of the wheat flour price of 9% and palm oil increases of 42% are the major factors to increase the price" and "Thanks to wellbeing boom, there was cost increases of new material development to replace chemical seasoning and other environment friendly costs". No mention of an agreement to fix prices with competitors was provided.

160. On February 18, 2008, Nong Shim stated that "recently, the sudden price increases of international ingredients like the price increase of wheat flour of 50% and palm oil increase of 94% and extreme weather changes, imbalance of supply and demand" caused an increase in Korean Noodle prices. No mention of an agreement to fix prices with competitors was provided.

161. On March 14, 2008, Samyang stated that "the wheat flour price increased 50%, palm oil price increased 95% and other ingredients prices increased with packaging cost, too" in order to justify a Korean Noodle price increase. No mention

1   of an agreement to fix prices with competitors was provided.

2   162.   As determined by the KFTC, the truth is that Korean Noodle price

3   increases substantially exceeded increased input costs.

4   163.   The affirmative acts of the defendants alleged herein, including acts in

5   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner

6   that precluded detection.

7   164.   By its very nature, Defendants' price-fixing conspiracy was inherently

8   self-concealing.

9   165.   The combination and conspiracy alleged herein was fraudulently

10   concealed by Defendants by various means and methods, including, but not limited to

11   secret meetings, surreptitious communications between defendants by the use of the

12   telephone or in-person meetings, the use of non-public emails, and concealing the

13   existence and nature of their competitor pricing discussions from non-conspirators

14   (including customers).

15   166.   As a result of Defendants' fraudulent concealment of their conspiracy,

16   the running of any statute of limitations has been tolled with respect to any claims that

17   Plaintiff and the Class members have as a result of the anticompetitive conduct

18   alleged in this complaint.

19                        **CLAIM FOR RELIEF**

20   **Violation of Sections 1 and 3 of the Sherman Action, 15 U.S.C. §§ 1, 3**

21   167.   Beginning at least as early as December 2000, Defendants and their co-

22   conspirators entered into a continuing combination or conspiracy to unreasonably

23   restrain trade and commerce in violation of Section 1 and 3 of the Sherman Act (15

24   U.S.C. §§ 1, 3) by artificially reducing or eliminating competition in the United

25   States.

26   168.   In particular, Defendants have agreed, combined and conspired to raise,

27   fix, maintain or stabilize the prices of Korean Noodles sold in the United States.

28

169.   As a result of Defendants' unlawful conduct, prices for Korean Noodles were raised, fixed, maintained and stabilized in the United States.

170.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among defendants and their co-conspirators.

171.   For purposes of formulating and effectuating their combination or conspiracy, defendants and their co-conspirators did those things they combined or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of Korean Noodles;

    b.    communicating in writing and orally to fix prices and manipulate the supply of Korean Noodles, including but not limited to communicating price increases with each other;

    c.    agreeing to manipulate prices and supply of Korean Noodles sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

    d.    pricing Korean Noodles in accordance with the agreements reached; and

    e.    selling Korean Noodles to customers in the United States at non-competitive prices.

172.   Defendants' conspiracy had the following effects, among others:

    a. price competition in the sale of Korean Noodles by Defendants has been restrained, suppressed, and eliminated in the United States;

    b. prices for Korean Noodles sold by Defendants has been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

1           c.  direct purchasers of Korean Noodles have been deprived of the benefit

2                  of free and open competition in the purchase of Korean Noodles.

3      173.  As a direct and proximate result of Defendants' unlawful conduct,

4 Plaintiff and other members of the Class have been injured in their business and

5 property in that they paid more for Korean Noodles than they otherwise would have

6 paid in the absence of Defendants' unlawful conduct.

7                                  **PRAYER FOR RELIEF**

8      WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf

9 and on behalf of the Class herein, adjudging and decreeing that:

10      A.    This action may proceed as a class action, with Plaintiff as the designated

11 Class representative and its counsel as Class Counsel;

12      B.    Defendants have combined and conspired in a *per se* violation of Section

13 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiff and the members of the Class

14 have been injured in their business and property as a result of defendants' violations;

15      C.    Plaintiff and the members of the Class recover damages sustained by

16 them, as provided by the federal antitrust laws, and that judgment in favor of Plaintiff

17 and the Class be entered against defendants, jointly and severally, in an amount to be

18 trebled in accordance with such laws;

19      D.    Defendants, their subsidiaries, affiliates, successors, transferees,

20 assignees and the respective officers, directors, partners, agents, and employees

21 thereof and all other persons acting or claiming to act on their behalf be permanently

22 enjoined and restrained from continuing and maintaining the conspiracy or agreement

23 alleged herein, including:

24               i.  continuing, maintaining or renewing the contract, combination or

25                  conspiracy alleged herein, or from engaging in any other contract

26                  combination or conspiracy having any similar purpose or effect,

27                  and from adopting or following any practice, plan, program or

28                  device having a similar purpose or effect; and

ii. communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of Korean Noodles, information concerning prices, customers, markets or other terms or conditions of sale of any such product except to the extent necessary in connection with bona fide sales transaction between the parties to such communications.

E.   Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.   Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and,

G.   Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

DATED:     July 22, 2013              Respectfully submitted,

GLANCY BINKOW & GOLDBERG LLP

By: _____
Lionel Z. Glancy
Michael Goldberg
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

Lee Albert
Gregory B. Linkh
**GLANCY BINKOW & GOLDBERG LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Email:  lalbert@glancylaw.com
        glinkh@glancylaw.com


Susan G. Kupfer
Joseph M. Barton
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Email: skupfer@glancylaw.com
        jbarton@glancylaw.com

YoungKi Rhee
**WE THE PEOPLE LAW GROUP**
15F The Salvation Army Bldg.,
476 Chungjeongro 3-Ka
Seodaemun-Ku, Seoul 120-837, Korea
Telephone: 822-2285-0062 (Dir.)
Facsimile:  822-2285-0071
Email: ykrhee@wethepeople.co.kr

Christopher L. Lebsock
**HAUSFELD LLP**
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Telephone:  415-633-1908
Email:  clebsock@hausfeldllp

Megan Jones
Mindy Pava
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington D.C.  20006
Telephone: 202-540-7200
Email: mjones@hausfeldllp
mpava@hausfeldllp.com


*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV13- 5274 PA (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Michael Goldberg (#188669)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PLAZA COMPANY, on Behalf of Itself and a Class of All Others Similarly Situated,<br><br>v.<br>PLAINTIFF(S)<br><br>Nong Shim Company., Ltd.; Nong Shim America, Inc.; Ottogi Company, Ltd.; Ottogi America, Inc.; Samyang Foods Company, Ltd.; Samyang USA; Paldo America; and Korea Yakult,<br>DEFENDANT(S). | CASE NUMBER<br><br>CV13-05274 -PA(RZx)<br><br>SUMMONS |

TO:   DEFENDANT(S):   The above-named Defendants.

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Michael Goldberg_____, whose address is _1925 Century Park East, Suite 2100, Los Angeles, CA 90067, Tel. (310) 201-9150_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _JUL 2 2 2013_

By: _MARILYN _____
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Michael Goldberg (#188669)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

THE PLAZA COMPANY, on Behalf of Itself and a
Class of All Others Similarly Situated,

PLAINTIFF(S)

v.

Nong Shim Company., Ltd.; Nong Shim America, Inc.;
Ottogi Company, Ltd.; Ottogi America, Inc.; Samyang
Foods Company, Ltd.; Samyang USA; Paldo America;
and Korea Yakult,

DEFENDANT(S).

CASE NUMBER

**CV13-05274 -PA(RZ)**

**SUMMONS**

TO:   DEFENDANT(S):   The above-named Defendants.

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, _Michael Goldberg_____, whose address is
_1925 Century Park East, Suite 2100, Los Angeles, CA 90067, Tel. (310) 201-9150_. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: JUL 2 2 2013 _____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

THE PLAZA COMPANY, on Behalf of Itself and a Class of All Others Similarly Situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Nong Shim Company., Ltd.; Nong Shim America, Inc.; Ottogi Company, Ltd.; Ottogi America, Inc.; Samyang Foods Company, Ltd.; Samyang USA; Paldo America; & Korea Yakult

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Michael Goldberg (# 188669), GLANCY BINKOW & GOLDBERG LLP, 1925 Century Park East, Suite 2100, Los Angeles, California 90067, Telephone: (310) 201-9150

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violation of Sections 1 and 3 of the Sherman Action, 15 U.S.C. Sections 1, 3

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| | | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** CV13-05274

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s):

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| California | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Nong Shim America, Inc., Ottogi America, Inc., Samyang USA, Paldo America - California | Nong Shim Co. Ltd., Ottogi Company, Ltd., Samyang Foods Co. Ltd., Korea Yakult - South Korea |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, California | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**                               DATE: July 22, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

**Key to Statistical codes relating to Social Security Cases:**

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |